RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0304P (6th Cir.)
File Name: 00a0304p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KENTUCKY ASSOCIATION OF
HEALTH PLANS, INC.;
ADVANTAGE CARE, INC.;
AETNA HEALTH PLANS OF
OHIO, INC.; CHOICECARE
HEALTH PLANS, INC.; FHP OF
OHIO, INC.; HMPK, INC.;
HPLAN, INC.; HUMANA
HEALTH PLAN, INC.,
      *Plaintiffs-Appellants,*

v.

No. 98-6308

GEORGE NICHOLS, III, in his
official capacity as
Commissioner of the
Kentucky Department of
Insurance,
      *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
Nos. 97-00024—Joseph M. Hood, District Judge.

Argued: September 20, 1999

Decided and Filed:  September 7, 2000

Before:  KENNEDY and NORRIS, Circuit Judges;
              HOLSCHUH,[*]  District Judge.

_____

**COUNSEL**

**ARGUED:**  Robert N. Eccles, O'MELVENY & MYERS, Washington, D.C., for Appellants.  Shaun T. Orme, KENTUCKY DEPARTMENT OF INSURANCE, Frankfort, Kentucky, for Appellee.  **ON BRIEF:**  Karen M. Wahle, O'MELVENY & MYERS, Washington, D.C., Barbara Reid Hartung, GREENEBAUM, DOLL & MCDONALD, Louisville, Kentucky, for Appellants.  Shaun T. Orme, Anna R. Gwinn, KENTUCKY DEPARTMENT OF INSURANCE, Frankfort, Kentucky, for Appellee.

   HOLSCHUH, D. J., delivered the opinion of the court, in which NORRIS, J., joined.  KENNEDY, J. (pp. 38-61), delivered a separate dissenting opinion with respect to Part III of the majority opinion.

_____

**OPINION**

_____

   HOLSCHUH, District Judge.  Plaintiffs are seven health maintenance organizations (HMOs) licensed under the laws of Kentucky, and the Kentucky Association of Health Plans, Inc., a non-profit association organized to promote the business interest of its HMO members (hereinafter referred to as "plaintiffs").  Plaintiffs filed this action against George Nichols III ("defendant"), in his official capacity as

-------

   [*]Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

Commissioner of the Kentucky Department of Insurance. Plaintiffs argued that Kentucky Revised Statutes Annotated §§ 304.17A-110(3) and 304.17A-171(1)–(8) (Banks-Baldwin 1995), should be found preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), and sought injunctive relief from their enforcement. Both parties moved for summary judgment. The district court denied plaintiffs' request for summary judgment and granted defendant's cross-motion for summary judgment, concluding that §§ 304.17A-110(3) and 304.17A-171(2) were saved from preemption by ERISA because they "regulated insurance" under ERISA's savings clause. Plaintiffs assert that the district court erred in this conclusion.

## I. The State Statutes

In 1994, the Kentucky General Assembly enacted the Kentucky Health Care Reform Act (the "Act"). The Act contained an "Any Willing Provider" provision that stated: "Health care benefit plans shall not discriminate against any provider who is located within the geographic coverage area of the health benefit plan and is willing to meet the terms and conditions for participation established by the health benefit plan." Ky. Rev. Stat. Ann. § 304.17A-110(3) (Banks-Baldwin 1995). The Act defined a health benefit plan as:

> [Any] hospital or medical expense policy or certificate; nonprofit hospital, medical-surgical, and health service corporation contract or certificate; a self-insured plan or a plan provided by a multiple employer welfare arrangement, to the extent permitted by ERISA; health maintenance organization contract; and standard and supplemental health benefit plan as established in KRS 304.17A-160. § 304.17A-100(4)(a) (Banks Baldwin 1995).

In 1996, the Kentucky General Assembly added §§ 304.17A-170 and 171 to the code. The additions specifically regulate

how "health benefit plans" can interact with chiropractors.[1] Not only does the statute contain an "any willing provider" provision addressed particularly to chiropractors,[2] but it also imposes various additional requirements on health benefit plans that include chiropractic benefits.[3]  *See* § 304.17A-171.

---

[1] Section 304.17A-170(1) states that "health benefit plan" has the same meaning as in § 304.17A-005, which provides in pertinent part:

"Health benefit plan" means any hospital or medical expense policy or certificate; nonprofit hospital, medical-surgical, and health service corporation contract or certificate; provider sponsored integrated health delivery network; a self-insured plan or a plan provided by a multiple employer welfare arrangement, to the extent permitted by ERISA; health maintenance organization contract; or any health benefit plan that affects the rights of a Kentucky insured and bears a reasonable relation to Kentucky, whether delivered or issued for delivery in Kentucky . . . .

§ 304.17A-005(17) (Banks Baldwin 1999).

[2] The "any willing provider" provision of § 304.17A-171(2) states: A health benefit plan that includes chiropractic benefits shall:
(2)  Permit any licensed chiropractor who agrees to abide by the terms, conditions, reimbursement rates, and standards of quality of the health benefit plan to serve as a participating primary chiropractic provider to any person covered by the plan.

[3] Specifically, health benefit plans are required to: include all primary chiropractic providers who are selected by a person covered by the plan; allow participants direct access to chiropractors of their choice without referral from a gatekeeper; appoint a chiropractor as a gatekeeper for the provision of chiropractic services when the plan uses gatekeepers; refrain from discriminating in reimbursement rates between chiropractors; refrain from promoting or recommending any chiropractor to a covered person; assure adequate numbers of providers are included in the plan; and make listings of participating chiropractors available to covered persons on a regular basis.  § 304.17A-171(1) & (3)–(8).

The district court apparently limited its analysis to Kentucky's "Any Willing Provider" provisions, the general provision being located at § 304.17A-110(3) and the specific chiropractic provision being located at § 304.17A-171(2).  The district court noted that the chiropractic statute imposed additional requirements, beyond those imposed by the general

---

Kentucky provisions impermissible "connection with" ERISA plans would continue, as ERISA plans would still be effectively prohibited from offering limited provider panels, as none would be available to them.  The only way that §§ 304.17A-110(3) and 304.17A-171(2) could be saved, would be to add language effectively allowing health care entities to offer limited provider networks to ERISA covered plans.  Because both Kentucky and federal case law prohibit us from adding language to a state statute to remove its conflict with federal law, see, e.g., *Musselman v. Commonwealth,* 705 S.W.2d 476, 477 (Ky. 1986), *Eubanks v. Wilkinson*, 937 F.2d 118, 120 (6th Cir. 1991), I conclude that §§ 304.17A-110(3) and 304.17A-171(2) are preempted in their entirety.  *See Prudential Ins. Co.,* 154 F.3d at 832 (concluding that the AWP statute at issue was preempted in its entirety); *Texas Pharmacy Ass'n*, 105 F.3d at 1039 (drawing the same conclusion).

Finally, I address whether the preempted provisions, provision (3) of § 304.17A-110 and provision (2) of § 304.17A-171, may be severed from their respective statutory sections or whether the sections must also be preempted.  Kentucky's severability statute indicates that unconstitutional provisions may presumptively be severed, unless severing the offending provisions makes it impossible to execute the remaining provisions of a statute in the manner the legislature intended.  It is clear that §§ 304.17A-110 and 304.17A-171 can be executed in accordance with the legislature's original intention without provision (3) and (2) respectively.  Accordingly, while I conclude that §§ 304.17A-110(3) and 304.17A-171(2) should be preempted in their entirety, the statutory sections they reside in should remain unaffected.

See also *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S. Ct. 1476, 94 L. Ed. 2d 661 (1987); *Regan v. Time, Inc.*, supra, at 653, 104 S. Ct. 3262.

*Mille Lacs Band of Chippewa Indians,* 119 S. Ct. at 1198. Therefore, as evidence of the legislature's intent I look to Kentucky's severability statute, which states:

> It shall be considered that it is the intent of the general assembly in enacting any statute, that if any part of the statute be held unconstitutional the remaining parts shall remain in force, unless the statute provides otherwise, or unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the general assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the intent of the general assembly.

Ky. Rev. Stat. Ann. § 446.090. The statute indicates that if any part of a Kentucky statute is found unconstitutional, it is the legislature's intent that the remaining provisions be saved. However, in drafting the statute the legislature also recognized that situations will exist where severing the offending parts cannot be considered as it would make it impossible to carry out the original legislative intent.

I begin my severability inquiry by addressing whether portions of Ky. Rev. Stat. Ann. §§ 304.17A-110(3) and 304.17A-171(2) may be severed in such a way that the provisions would not be preempted in their entirety. Because I believe that §§ 304.17A-110(3) and 304.17A-171(2) contain an impermissible connection with ERISA covered plans, there is no way to save the provisions themselves from preemption by severing particular parts while leaving the rest intact. Even if it were possible to do so, merely removing any prohibited "references to" ERISA plans would not suffice. The

In April of 1997, plaintiffs filed suit in the Eastern District of Kentucky, requesting that § 304.17A-110(3) and § 304.17A-171 (for convenience we will collectively refer to § 304.17A-110(3) and § 304.17A-171(2) as Kentucky's "AWP" laws) be declared, among other things, preempted by § 514(a) of ERISA, 29 U.S.C. § 1144(a). Plaintiffs moved for partial summary judgment on the issue and Commissioner Nichols cross-moved for partial summary judgment as well. The district court determined that while the Kentucky AWP laws were related to employee benefit plans under ERISA § 514(a), they regulated the business of insurance and therefore fell under the saving clause of § 514(b), 29 U.S.C. § 1144(b)(2)(A). The court thus granted partial summary judgment in favor of Commissioner Nichols and determined its order to be final and appealable. This appeal followed.

Sections 304.17A-110(3) and 304.17A-100(4)(a) were repealed by the Kentucky legislature effective July 1, 1999. The parties acknowledge that this appeal is not moot, however, as the legislature, through House Bill No. 315 (Ky. 1998), replaced the repealed provisions with the same requirements, but substituted the term "health insurer" for "health benefit plan" in its any willing provider provision, now located at Kentucky Revised Statutes Annotated § 304.17A-270 (Banks-Baldwin 1999). The Bill's definition of "insurer" was codified at Kentucky Revised Statutes Annotated § 304.17A-005(22) (Banks-Baldwin 1999), which defines "insurer" as:

> [A]ny insurance company; health maintenance organization; self-insurer or multiple employer welfare arrangement not exempt from state regulation by ERISA;

---

"any willing provider" statute, but because both statutes "similarly define 'health benefit plan'" the court referred to those statutes collectively. J.A. at 35. Because the court never explicitly addressed provisions (1) and (3)–(8) of § 304.17A-171, the chiropractic statute, we will remand the issue of their preemption for consideration in the first instance by the district court.

provider- sponsored integrated health delivery network; self-insured employer-organized association, or nonprofit hospital, medical-surgical, dental, or health service corporation authorized to transact health insurance business in Kentucky.

The parties having agreed that this appeal is not rendered moot by the new language used in the present statutes, the court will consider the AWP laws in their present form in the court's analysis of their validity, rather than adjudicating the validity of repealed statutes.

The chiropractic provisions contained in § 304.17A-171 and § 304.17A-170 were left intact by House Bill No. 315 and continue to remain unchanged.

The issue of the potential preemption of §§ 304.17A-270 and 304.17A-171(2) by ERISA is therefore properly before this court.[4] We review a district court's decision to grant summary judgment *de novo*, applying the same test as that employed by the district court. *Wathen v. General Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *See Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 892-93 (6th Cir. 1996).

## II. Preemption

We are required by this appeal to define the boundaries of preemption under ERISA § 514 (a) and (b), 29 U.S.C.

---

[4]The appeal taken from *Community Health Partners v. Commonwealth of Kentucky*, 14 F. Supp. 2d 991 (W.D. Ky. 1998), raised the question of whether § 304.17A-110(3) (replaced by § 304.17A-270) was preempted under ERISA and was argued the same day as this case. As a result, this opinion will necessarily dictate the outcome of that case as well.

## II. Severability

Because I believe that Kentucky's AWP provisions, Ky. Rev. Stat. Ann. § 304.17A-110(3) and 304.17A-171(2) (Banks-Baldwin 1995), are preempted by 29 U.S.C. § 1144(a) and not saved by the savings clause of 29 U.S.C. § 1144(b)(2)(A), I write separately to address whether the laws should be invalidated in their entirety, or whether the offending provisions of the statutes may be severed in whole or part. While never explicitly stating so, as discussed above, the majority appears to agree that Kentucky's AWP laws are preempted at least in their application to HMOs and HSCs who are performing administrative or related duties for self-insured employee benefit plans. However, despite implicitly drawing this conclusion, the majority still concludes that the AWP law is saved by the insurance savings clause. In doing so, the majority fails to mention, let alone discuss, how it severs Kentucky's AWP provision in such a manner that it no longer applies to third party plan administrators performing administrative functions for self-insured plans, thereby allowing it to conclude that the provision is saved in all other applications.

The Supreme Court has often stated that the inquiry into whether a statute is severable is essentially an inquiry into legislative intent. *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 119 S. Ct. 1187, 143 L. Ed. 2d 270 (1999); *Zobel v. Williams*, 457 U.S. 55, 64, 102 S. Ct. 2309, 2315, 72 L. Ed. 2d 672 (1982); *Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S. Ct. 3262, 3269, 82 L. Ed. 2d 487 (1984) (plurality opinion). In discerning the legislature's intent, the Court has directed that:

Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law. *Champlin Refining Co. v. Corporation Comm'n of Okla.*, 286 U.S. 210, 234, 52 S. Ct. 559, 76 L. Ed. 1062 (1932).

was not available before the law. Rather, Kentucky's AWP laws merely force insurers to potentially make additional contractual arrangements with providers they might otherwise exclude. The medical conditions covered remain unaffected and the insureds are still limited to the plan's network of providers. Therefore, I must conclude that Kentucky's AWP law is not integral to the insured-insurer relationship.

Finally, I consider whether the Kentucky AWP laws are limited to entities within the insurance industry. As discussed under the common sense test, I do not believe this to be the case. The law not only regulates entities that fall outside the traditional definition of insurer, it also extends to include entities in no way involved in underwriting risks. In fact, a review of the statute shows that while it may affect the way that some insurance companies run their business, it has nothing to do with the underwriting of risk, the traditional earmark of insurance. *See Royal Drug*, 440 U.S. at 211-12, 99 S. Ct. at 1073-74. Accordingly, I believe that Kentucky's AWP laws fail the third prong of the McCarran-Ferguson test as well.

In sum, I am forced to conclude that §§ 304.17A-110(3) and 304.17A-171(2), Kentucky's AWP laws, are not saved from preemption as laws that regulate the business of insurance, because under ERISA § 514(b), they fail to meet not only the common sense test, but also all of the McCarran-Ferguson factors.[17] While federalism concerns prohibit federal courts from lightly preempting acts of a state legislature, I agree with the Eighth Circuit's observation in *Prudential Ins. Co.* that, "it is for Congress, not the courts, to reassess ERISA in light of modern insurance practices and the national debate over health care." *Prudential Ins. Co.*, 154 F.3d at 829-30.

---

[17]As we indicated above, the parties have agreed that our holding with regard to § 304.17A-110(3) will serve to determine whether § 304.17A-270 is preempted as well.

§ 1144(a) and (b). Section 514(a), the preemption provision, reads:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title (emphasis added).

Section 514(b)(2)(A), the "savings" provision, reads:

Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or securities.

Section 514(b)(2)(B), the "deemer" provision, reads:

Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

The federal courts have addressed the scope of ERISA's preemption of State law on numerous occasions; however, the wording of the Act combined with the obvious federalism concerns involved have made it difficult to discern clear boundaries. Many courts, including the Supreme Court, have commented on the vexingly broad and ambiguous nature of

the provisions.[5]  Despite such interpretational difficulties, we must determine whether Kentucky Revised Statutes Annotated §§ 304.17A-270 and 304.17A-171(2) (Banks-Baldwin 1999) "relate to" employee benefit plans covered by ERISA.  If so, then the provisions are preempted, unless they fall under ERISA's saving clause as laws regulating insurance.

ERISA is a comprehensive act designed to regulate employee welfare and pension benefit plans, including those that provide "'medical, surgical, or hospital care or benefits' for plan participants or their beneficiaries 'through the purchase of insurance or otherwise.'" *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 650–51, 115 S. Ct. 1671, 1674, 131 L. Ed. 2d 695, 702 (1995) (discussing and quoting ERISA § 3(1), 29 U.S.C. § 1002(1)).  To assure that the regulation of employee welfare benefits would remain an area of exclusive federal concern, Congress passed § 514(a) of ERISA, the preemption provision.

The Supreme Court has specifically found that in passing § 514(a) it was Congress' intent:

---

[5] *See, e.g.*, *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335–36, 117 S. Ct. 832, 843, 136 L. Ed. 2d 791, 805-06 (1997) (Scalia, J., concurring) (noting that the Court had taken 14 previous cases regarding ERISA preemption, and suggesting that neither the Court's prior decisions, nor its present one, succeeded in bringing clarity to the law); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656, 115 S. Ct. 1671, 1677, 131 L. Ed. 2d 695, 705 (1995) (remarking on the unhelpful nature of the statute's text and the frustrating difficulty of defining its key terms); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S. Ct. 2380, 2389, 85 L. Ed. 2d 728, 740 (1985) (observing that the provisions were "not a model of legislative drafting"); *Prudential Ins. Co. of Am. v. National Park Med. Ctr., Inc.*, 154 F.3d 812, 818 (8th Cir. 1998) (comparing efforts to discern the scope of ERISA preemption to unraveling the fabled Gordian knot).

AWP law not to be integral to the insurer-insured relationship, as it defined only the terms between the insurer and providers, and distinguishing *Gregoire* because Washington's any category of provider law *did* affect the insurer-insured relationship by expanding the kinds of treatment the policy must cover); *Cf.*, *Pilot Life Co. v. Dedeaux*, 481 U.S. 41, 50–51, 107 S. Ct. 1549, 1554-55 (1987) (noting that Mississippi's law of bad faith, in contrast to the mandated benefits law in Metropolitan Life, did not define the terms between the insurer and insured, and thus only affected the insurer-insured relationship in an attenuated way).  The Court's discussion of California's notice-prejudice rule in *Unum Life Ins. Co. of America v. Ward*, 119 S. Ct. at 1389-90 (1999), provides an illuminating example of what qualifies as an integral policy relationship under the McCarran-Ferguson factors.  The Supreme Court observed that:

> [California's notice-prejudice rule] serves as an integral part of the policy relationship between the insurer and insured. *Metropolitan Life*, 471 U.S. at 743, 105 S. Ct. 2380.  California's rule changes the bargain between insurer and insured; it effectively creates a mandatory contract term that requires the insurer to prove prejudice before enforcing a timeliness-of-claim provision.

*Id.*  In sharp contrast, Kentucky's AWP provisions leave the contract terms between the insurer and insured, unaltered. The relationships directly affected by the law are those existing between insurers and third parties (*i.e.*, medical providers).  As discussed above, the medical risks covered by the policy remain the same.  Thus, even if an insured's preferred provider decides to join the insured's network, and complies with its terms in doing so, the medical coverage that the insurer has contracted to underwrite remains unchanged. Unlike the mandated benefit laws at issue in *Metropolitan Life*, the mandated provider law in *Gregoire*, or the mandatory notice-prejudice rule in *Ward*, Kentucky's AWP laws do not force the insurer to offer a benefit to insureds that

*Royal Drug* and imported into ERISA preemption analysis in *Metropolitan Life*, without any indication that its past precedent interpreting whether a law "regulates insurance" under ERISA's savings clause was called into doubt. *See Ward*, 119 S.Ct. 1380, 1388 (1999).[16] Until the Court indicates that its *Royal Drug* business of insurance test is no longer appropriate in the ERISA savings clause context, something that it has yet to do, I believe we must continue to apply the test as dictated by the Court's precedent.

Moving to the second McCarran-Ferguson factor, I consider whether Kentucky's AWP laws affect an integral part of the policy relationship between the insurer and insured. The majority asserts that the district court was correct in finding that Kentucky's AWP laws dictate a substantive term of the contract between the insurer and insured and are thus an integral part of this relationship. As support for this proposition, the majority again cites *Stuart Circle*, which concluded that because Virginia's AWP law affected treatment and cost (through the same attenuated manner in which the court concluded risk was spread) it was integral to the insurer-insured relationship. 995 F.2d 500 at 503.

Again I find *Stuart Circle* unconvincing. The effect of Kentucky's AWP laws center on the insurer-provider relationship. The terms of the insurer-insured relationship are only affected in a very indirect manner, making it difficult to see the AWP laws as integral to that relationship. *See Prudential Ins. Co.*, 154 F.3d at 830 (finding the Arkansas

---

[16]The district court in *Community Health Partners v. Commonwealth of Kentucky*, 14 F.Supp.2d 991 (W.D. Ky. 1998) observed that *United States v. Fabe*, 508 U.S. 491, 113 S. Ct. 2202, 124 L. Ed.2d 449 (1993) might be argued to change and broaden savings clause analysis in the ERISA context. However, other federal courts have not reached this conclusion and the Supreme Courts most recent opinion in *Ward* gives no indication that the Court's savings clause analysis has changed. *See also, Prudential Ins. Co.*, 154 F.3d at 827-828 (concluding that *Fabe* had no effect on savings clause analysis).

to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government . . ., [and to prevent] the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

*Travelers*, 514 U.S. at 656–57, 115 S. Ct. at 1677, 131 L. Ed. 2d at 706 (alteration in original) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142, 111 S. Ct. 478, 484, 112 L. Ed. 2d 474, 486 (1990)). In discussing the preemption provision, the Court has variously noted its extreme breadth, terming it "clearly expansive," "broad [in] scope," "broadly worded," "deliberately expansive," and "conspicuous for its breadth." *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324, 117 S. Ct. 832, 837, 136 L. Ed. 2d 791, 799 (1997) (internal citations omitted) (reviewing past Supreme Court case law addressing the scope of ERISA's preemption provision). The preemption provision, however, is not without limits. As the Court noted in *Travelers*, § 514(a) preempts all state laws that relate to an employee benefit plan covered by ERISA, but, "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminancy, then for all practical purposes preemption would never run its course." 514 U.S. at 655, 115 S. Ct. at 1677, 131 L. Ed. 2d at 705.

Thus, to determine whether a law "relates to" an employee benefit plan, the Court has formulated a two part test, under which a "law 'relate[s] to' a covered employee benefit plan for purposes of § 514(a) if it [1] has a *connection with* or [2] *reference to* such plan." *Dillingham*, 519 U.S. at 324, 117 S. Ct. at 837, 136 L. Ed. 2d at 799 (internal quotations and citations omitted) (emphasis added). The district court found, and plaintiffs argue, that the Kentucky AWP provisions both refer to and have a connection with ERISA covered employee

benefit plans.[6]  We analyze each prong of the "relation to" test in turn.

### A. Reference To

The Supreme Court has provided guidance in several cases as to when a law "refers to" ERISA.  In *Dillingham* the Court summarized its analysis, stating:

> [W]e have held preempted a law that "impos[ed] requirements by reference to [ERISA],"*District of Columbia v. Washington Bd. of Trade*, 506 U.S. 125, 130–31 (1992); a law that specifically exempted ERISA plans from an otherwise generally applicable garnishment provision, *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 828 n.2 (1988); and a common-law cause of action premised on the existence of an ERISA plan, *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990).  Where a State's law acts immediately and exclusively upon ERISA plans, as in *Mackey*, or where the existence of ERISA plans is essential to the law's operation, as in *Greater Washington Bd. of Trade* and *Ingersoll-Rand*, that "reference" will result in preemption.

519 U.S. at 324–25, 117 S. Ct. at 837–38, 136 L. Ed. 2d at 799.

---

[6]The Western District of Kentucky in *Community Health Partners, Inc. v. Kentucky,* 14 F. Supp. 2d 991, 995-1001 (W.D. Ky. 1998), also found the AWP provisions "related to" ERISA plans, but only under the "connection with" prong of the "relation to" analysis.  That court did not believe that the statute referred to ERISA plans in the manner that Supreme Court precedent requires for preemption under the "reference to" prong.  Specifically, the court believed that under *Dillingham*, a law will only "refer to" an ERISA plan for preemption purposes if it "acts immediately and exclusively upon ERISA plans" or "where the existence of ERISA covered plans is essential to the law's operation." *Id.* at 995–96.  We disagree with the district court's "reference to" analysis for the reasons set forth in this opinion.

policyholder and insurer that a specific medical contingency will occur.

The majority attempts to escape from *Royal Drug's* teaching by relying on dicta from *American Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.*, 973 F. Supp. 60 (D. Mass. 1997), in which the court questioned "whether the holding of *Royal Drug* may be translated into the ERISA preemption context at all." *Id.* at 72.  The *American Drug Store* court was referring to the fact that *Royal Drug* interpreted the scope of the antitrust exemption under § 2(b) of the McCarran-Ferguson Act, but did not address §§ 1 and 2(a) of the act, which preserved a State's ability to regulate the "business of insurance" from Commerce Clause attack. *See Royal Drug*, 440 U.S. at 219 n.18, 99 S. Ct. at 1077.[15]  However, the Supreme Court has not indicated that it is troubled by this distinction.  As recently as last term, the Court employed the McCarran-Ferguson factors it created in

---

contract with a large retail drug chain whereby its policyholders could obtain drugs under their policies only from stores operated by this chain.  The justification for such an agreement would be administrative and bulk-purchase savings resulting from obtaining all of the company's drug needs form a single dealer.  Even though these cost savings might ultimately be reflected in lower premiums to policyholders, would such a contract be the "business of insurance?"  Or suppose that the insurance company should decide to acquire the chain of drug stores in order to lower still further its costs of meeting its obligations to its policyholders.  Such an acquisition would surely not be the "business of insurance."

440 U.S. at 215, 99 S. Ct. at 1075.  If such agreements are not the "business of insurance," then it follows that a state's attempts to regulate these agreements would not qualify as such either.

[15]The majority appears to be persuaded by this reasoning.  I do not draw the same conclusion.  However, even if the meaning of "business of insurance" was broadened beyond the contractual relationship between the policyholder and insurer, I do not believe that Kentucky's AWP law would qualify.  As I have explained elsewhere, Kentucky's AWP laws have at most a speculative and tangential effect on this relationship.

McCarran-Ferguson factors.  Discussing whether the law transferred or spread policyholder risk, the court concluded that the Virginia statute "affects the type and cost of treatment available to an insured."  *Id.*  The court reached this conclusion because it believed that without the AWP law, policyholders might on occasion attend a doctor outside of their plan network, due to a personal preference for that doctor, and in doing so, would be forced to shoulder all or part of the cost. *See id.*

I am unpersuaded by the majority's argument that *Stuart Circle*'s attenuated risk spreading rationale should be applied to Kentucky's AWP laws.  As I have discussed, Kentucky's AWP laws do not require health benefit plans to include a single additional provider unless the qualified provider, not the policyholder, decides to join the plan.  Policyholders are not necessarily any better off than they were before the law was passed, only benefitting from the law if their provider is both willing to join their particular provider network and able to meet its requirements.  The insurance policy and the contingencies it underwrites, *i.e.*, the risk that insured will need medical treatment for a condition covered under the policy, remain the same, regardless of Kentucky's AWP law.[14]  There is no shifting of the risk between the

---

applied to "insurers," defined within the Chapter to mean "an insurance company" which is itself defined as "any company engaged in the business of making contracts of insurance." Va. Code Ann. § 38.2-100. Thus, Virginia's AWP statute was more narrow in scope than Kentucky's, quite specifically limiting its application to the term "insurance companies," defined by the statute to include only companies actively issuing insurance contracts.  Consequently, Virginia's statute would clearly not apply to entities engaged in only administrative functions for an employee benefit plan.

[14]The conclusion that Kentucky's AWP laws are not the business of insurance is supported by the following rhetorical question which the Supreme Court posed in *Royal Drug*.  The court addressed a scenario which essentially involved limited provider networks, stating:

Suppose, for example, that an insurance company entered into a

In *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 108 S. Ct. 2182, 100 L. Ed. 2d 836 (1988), the Court discussed Georgia Code Annotated § 18-4-22.1 (1982), which specifically exempted ERISA plans from Georgia's general garnishment law.  The Court noted that even though Georgia's legislature may have enacted § 18-4-22.1 to help effectuate ERISA's underlying purpose, it would still be preempted if it fell within ERISA's preemption provision.  Finding that § 18-4-22.1 was indeed preempted, the Court stated:

> [A]dhering to our precedents in this area, we hold Ga. Code Ann. § 18-4-22.1, which singles out ERISA employee welfare benefit plans for different treatment under state garnishment procedures, is preempted under § 514(a).  The state statute's express reference to ERISA plans suffices to bring it within the federal law's preemptive reach.

*Mackey*, 486 U.S. at 830, 108 S. Ct. at 2186, 100 L. Ed. 2d at 844.  In a footnote, the Court indicated that the "different treatment" was illustrated not just by the express reference to ERISA plans in the statute's language, but also in the disparate treatment accorded to non-ERISA pension and benefit plans under Georgia law. *See id*. at n.4.  The effect was that only ERISA welfare benefit plans were singled out for protection under the statute, an impermissible result.

The district court in the case at bar relied on *Mackey* in determining whether Kentucky's AWP statutes referred to an ERISA plan.  The district court first observed that under Kentucky's statute, "health benefit plans" were defined to include, among other things, "a self-insured plan or plan provided by a multiple employer welfare arrangement, to the extent permitted by ERISA."  Based on this language, the court concluded that "it is clear that the AWP statutes 'refer to' ERISA employee benefit plans."  In support, the court cited *De Buono v. NYSA-ILA Medical & Clinical Services Fund*, 520 U.S. 806, 815, 117 S. Ct. 1747, 1752, 138 L. Ed.

2d 21, 30 (1997), which cited *Mackey* for the principle that a provision that explicitly refers to ERISA in defining the scope of the state law's application is preempted.

The district court noted that the Western District of Kentucky in *Community Health Partners, Inc. v. Kentucky*, 14 F. Supp. 2d 991 (W.D. Ky. 1998), disagreed with its analysis of the same statute. The *Community Health Partners* court, relying on language in *Dillingham*, found that Kentucky's AWP statute did not "refer to" an ERISA plan because the law did not act "immediately and exclusively upon ERISA plans" and because the existence of ERISA plans was not essential to the law's operation. *Id.* at 995–96. However, the district court in the present case disagreed with the *Community Health Partners* court, finding that *"Mackey* makes it clear that when a statute 'singles out ERISA employee benefit plans for different treatment' the statute's 'express reference to ERISA plans suffices to bring it within the federal law's preemptive reach.'" J.A. at 12 n.6.

Other courts have reached similar conclusions. The Eighth Circuit in *Prudential Insurance Co. of America v. National Park Medical Center, Inc.*, 154 F.3d 812 (8th Cir. 1998), found that an Arkansas AWP statute containing language comparable to Kentucky's provisions was preempted due to its reference to employee benefit plans covered by ERISA. The court noted that the law expressly stated its provisions "shall not apply to self-funded or other health benefit plans that are exempt from state regulation by virtue of [ERISA]." *Id.* at 822. Accordingly, the court determined that § 23-99-209 of the Arkansas Patient Protection Act ("PPA") referred to ERISA plans, as it "undeniably makes an express reference to ERISA and attempts to exclude from coverage of the PPA at least some ERISA plans. Thus it 'singles out ERISA employee benefit plans for different treatment under state [law], [and therefore] is preempted under § [1144(a)].'" *Id.* at 824 (quoting *Mackey*). *See also Cigna Health Plan of La., Inc. v. Louisiana*, 82 F.3d 642, 647–48 (5th Cir. 1996) (concluding that Louisiana's AWP statute, § 2202(5)(c) of the

arrangements. However, the majority concludes that the policyholders *were* concerned with restrictions on their freedom of choice in seeking medical treatment. Ignoring for a moment the fact that Kentucky's AWP laws do not allow policyholders the freedom to choose their own doctor, and thus only addresses this concern in at best a very tangential way, any concerns over freedom of choice are beside the point. The critical issue with respect to the risk spreading prong, as well as whether the law regulates insurance as a matter of common sense, is whether or not the law is related to the risks underwritten by the insurer. As the Court noted in *Royal Drug,* while discussing the meaning of "business of insurance" under the McCarran-Ferguson Act: "It is important, therefore, to observe at the outset that the statutory language in question here does not except the business of insurance companies from the scope of the antitrust laws. The exemption is for the 'business of insurance,' not the 'business of insurers.'" *Id*. at 210–11, 99 S. Ct. at 1073. Because Kentucky's AWP laws seek to merely regulate the "business of insurers" by dictating how they structure their provider networks, irrespective of the risks they underwrite, they should not qualify for savings clause protection.

The majority points to *Stuart Circle Hosp. Corp. v. Aetna Health Management*, 995 F.2d 500 (4th Cir. 1993), as support for its contention that Kentucky's AWP laws do transfer risk. *Stuart Circle* involved a Virginia statute which required insurers to accept any willing provider if they established preferred provider networks. The court concluded that while the statute "related to" ERISA plans, it was not preempted, because it fell within ERISA's savings clause as a law regulating insurance. *Id.* at 504. After finding the common sense test satisfied, in part because the law was located within Virginia's insurance code,[13] the court moved on to the

---

[13]As indicated above, this fact should have little to do with determining whether a law is specifically directed at the insurance industry, as any law may be inserted within the insurance provisions of a state code. Further, the Virginia statute at issue, § 38.2-3407, only

In discussing the nature of insurance, the *Royal Drug* Court referred to *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 79 S. Ct. 618, 3 L. Ed. 2d 640 (1959), quoting it for the proposition that "the concept of insurance involves some investment risk-taking on the part of the company." The Court noted that while petitioners didn't dispute this fact, they maintained that the pharmacy agreements did involve the underwriting of risk. To this end, they argued that Blue Shield accepted a premium and assumed the risk that policyholders would need prescription drugs by agreeing to enter into contracts with existing pharmacies to provide such drugs for promised reimbursement from Blue Shield. The Court observed that "the fallacy of petitioner's position is that they confuse the obligations of Blue Shield under its insurance policies, which insure against the risk that the policyholders will be unable to pay for prescription drugs during the period of coverage, and the agreements between Blue Shield and the participating pharmacies, which serve only to minimize the costs Blue Shield incurs in fulfilling its underwriting obligations." The court then noted that the benefit promised to the policyholders, that they would only have a two-dollar co-payment for any prescriptions, remained unchanged by the arrangement.

As a result the court concluded that Blue Shield's arrangements left policyholders basically unconcerned (from a financial perspective) about the arrangements Blue Shield entered into with participating pharmacies. This is not to say that at least some participants would not be disappointed by the fact that their pharmacy of choice might not have been included, if for example it was not large enough to provide prescriptions for only a two-dollar markup. However, the *financial risks* that Blue Shield agreed to cover remained unchanged, leaving the policyholders without concern for Blue Shield's cost savings agreements with the larger pharmacies.

As the majority notes, in the case at bar the policyholders were also unconcerned with the insurer's compensation

State's Health Care Cost Control Act, which applied to "group purchasers," referred to ERISA qualified plans by defining "group purchasers" to include entities such as "'Taft-Hartley trusts or employers who establish or participate in self-funded trusts or programs' which 'contract [with health care providers] for the benefit of their . . . employees.'").

Although in the recent case of *Washington Physicians Service Association v. Gregoire*, 147 F.3d 1039 (9th Cir. 1998), *cert. denied*, 525 U.S. 1141, 119 S. Ct. 1033, 143 L. Ed. 2d 42 (1999), the court found that Washington's "every category of provider" statute did not contain a "reference to" or "connection with" employee benefit plans, the statute at issue is distinguishable from Kentucky's AWP laws. The court noted that by the statute's definition, "health carrier" only included disability insurers, health care service contractors, or health maintenance organizations. *See id.* at 1043. Employer-sponsored, self-funded plans were excluded not by a provision of the act, but rather by limiting the act's application to only the mentioned entities. As a result, the act contained no reference whatsoever to ERISA-covered employee benefit plans.

While a mere reference to an ERISA plan, without more, may not be enough to cause preemption, Supreme Court precedent shows that if such a reference is combined with some effect on those plans, such as singling them out for different treatment, preemption will result. *See, e.g., Mackey*, 486 U.S. at 830 n.4, 108 S. Ct. at 2186, 100 L. Ed. 2d at 844; *cf. District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 113 S. Ct. 580, 121 L. Ed. 2d 513 (1992) (finding that a state law that imposes requirements merely by reference to ERISA is preempted).

We conclude that Kentucky's AWP statutes "relate to" ERISA plans and are therefore preempted, unless they are found to be statutes that regulate "insurance" under the savings clause of § 514(b)(2)(A). This conclusion also involves consideration of the "deemer" clause, § 514(b)

(2)(B), which ensures that ERISA employee benefit plans are not deemed to be engaged in the business of insurance in applying the savings clause. Under the deemer clause, state insurance laws that apply directly to ERISA *self-insured* plans do not fall within the savings clause and thus are preempted. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985); *FMC Corp. v. Holliday*, 498 U.S. 52, 111 S. Ct. 403, 112 L. Ed. 2d 356 (1990).

The Kentucky legislature, aware of its inability to regulate self-insured ERISA plans, sought to include such plans – as well as multiple employer welfare arrangements (MEWAs) – only "to the extent permitted by ERISA." The effect of this provision is to exclude self-insured ERISA plans from coverage of the statute by virtue of the deemer clause and to include MEWAs only to the extent state regulation is permitted under 29 U.S.C. § 1144(B)(6).[7] In *Community Health Partners v. Commonwealth of Kentucky,* 14 F. Supp. 2d 991 (W.D. Ky. 1998), District Judge McKinley pointed this out in his opinion:

> The fact that the Kentucky legislature chose to allow for regulation of MEWAs and self-insured plans "to the extent permitted by ERISA" suggests that the legislature was well aware of the preemptive force of ERISA. As noted by Defendant, the phrase appears merely to restate the "deemer clause" by exempting self-insured ERISA plans from the scope of the AWP statute. The "deemer clause" prevents a state law from "deeming" an employee benefit plan to be an insurance company for the purpose of any law purporting to regulate the business of insurance. 29 U.S.C. 1144 (b)(2)(B). The deemer clause thus effectively prevents states from subjecting self-insured plans to state insurance regulation. On the other

---

[7]29 U.S.C. § 1144(B)(6) permits state laws that regulate insurance to apply to MEWAs under the circumstances set forth in that section.

different from actually entering into such agreements, because, as the Supreme Court observed, "only pharmacies that can afford to distribute prescription drugs for less than this $2 markup can profitably participate in the plan." *Id*. at 209, 99 S. Ct. at 1072. As a result, the insurer's promise to enter into agreements with all pharmacies was essentially an empty one, as only larger, high volume pharmacies could afford to enter into such an agreement. Such a hollow offer provides no real basis to distinguish the case from the limited provider networks at issue in the case at bar.

Similarly, Kentucky's AWP laws have almost no effect on the policyholder risk that insurers must underwrite. Like Blue Shield's unchanged obligation to cover a policyholder's prescriptions after entering into the pharmacy agreements, Kentucky insurers must cover the same medical procedures after the AWP law as they would have to if the AWP provision had not been enacted. It is true that the AWP laws would likely force insurers to pay higher rates, however, as in *Royal Drug*, this would only affect the price that insurers must pay for procedures covered in the policies they have issued, not the type of policyholder risks that they contractually must cover.[12] *Accord, Prudential Ins. Co.*, 154 F.3d at 828 (finding that the Arkansas AWP statute plainly did not spread risk, and noting that appellants did not even attempt to argue to the contrary).

---

[12]Under Kentucky's AWP law, benefit plans can no longer guarantee a limited panel of providers to which other doctors will not be added to handle the plan's patients. To the extent that contracts between benefit plans and providers contained such exclusivity provisions, under the majority's holding they will no longer be enforceable. While the likely result is an increase in the price that insurers must pay, this is not because of an increase in risk, but rather it is due to a decrease in the volume discount an insurer can command if policyholders are spread across a potentially larger network of plan doctors. *See Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 213-15, 99 S. Ct. 1067, 1074-76, 59 L. Ed. 2d 261 (1979).

preferred doctor,[11] they will still be restricted to the doctors in their benefit plan network regardless of the membership or nonmembership of their preferred doctor.

The Supreme Court discussed the transfer of policyholder risk in detail in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S. Ct. 1067, 59 L. Ed. 2d 261 (1979). The Court was considering whether agreements between Blue Shield and participating pharmacies concerning the price that policyholders would pay for prescriptions, constituted the business of insurance. Under the agreements, the participating pharmacies would fill any Blue Shield policyholder's prescription for a two-dollar charge. *See id.* at 209, 99 S. Ct. at 1072. The pharmacy was then entitled to reimbursement from Blue Shield for the cost of acquiring the drugs prescribed. *See id.* The Court found that, under the antitrust exemption provision of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), the arrangement did not constitute the "business of insurance" because Blue Shield's agreement with the pharmacies merely limited the *amount* that it would have to pay to cover its policyholder risks. *See id.* at 214-15, 99 S. Ct. at 1075. While realizing that the policyholders might ultimately benefit in the form of lower rates charged by Blue Shield, the Court concluded that no additional policyholder risks were being underwritten. Instead, the Court saw the agreements as merely arrangements for the purchase of goods and services by Blue Shield and thus not the "business of insurance." *See id.* at 214, 99 S. Ct. at 1075.

The majority attempts to distinguish *Royal Drug* on the grounds that "[u]nlike the health plans that are the subject of the Kentucky statute, the insurer in *Royal Drug* did not restrict the number of providers in question." However, the insurer in *Royal Drug* merely *offered* to enter into agreements with each licensed pharmacy in Texas. This is significantly

---

[11] If their doctor met the plans qualifications, had wanted to join the plan, but was denied membership, that doctor could no longer be kept out of the network if he or she still wished to join.

hand, insured plans – plans that purchase insurance – are subject to state laws regulating the insurance industry. *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985).

*Id.* at 995 n.4.

As the Supreme Court noted in *UNUM Life Insurance Co. v. Ward*, 526 U.S. 358, 367 n.2, 119 S. Ct. 1380, 1386, 143 L. Ed. 2d 462, 472 (1999):

Self-insured ERISA plans ... are generally sheltered from state insurance regulation.

The Kentucky Act provides that shelter by its exclusion of ERISA self-insured plans from its coverage, but its reference to ERISA plans and its exclusion of self-insured ERISA plans from its coverage clearly bring the statute within the "refer to" prong of the "relate to" analysis.

### B. Connection With

While the fact that the Kentucky statutes "refer to" ERISA employee benefit plans is enough to potentially preempt them on that basis alone, their "connection with" such plans offers an alternative basis for such preemption. Analysis under the "connection with" prong has changed somewhat after the Supreme Court's opinion in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995).[8]

---

[8] In *De Buono v. NYSA-ILA Medical & Clinical Services Fund*, 520 U.S. 806, 117 S. Ct. 1747, 138 L. Ed. 2d 21 (1997), the Court explained its change in focus, stating that its earlier ERISA cases had not required a fine analysis of the scope of ERISA's "relate to" language, because the state laws at issue had a clear "connection with or reference to" ERISA benefit plans. *De Buono*, 520 U.S. at 813, 117 S. Ct. at 1751, 138 L. Ed. 2d at 28-29. The Court explained that in *Travelers*, however, it was forced to confront directly whether ERISA's "relates to" language altered the normal starting presumption that Congress does not intend to supplant

The *Travelers* Court discussed whether ERISA's preemption provision altered the starting presumption that Congress does not intend to supplant state law. *See id.* at 654–55, 115 S. Ct. at 1676-77, 131 L. Ed. 2d at 704. While observing that this presumption remained unaltered, the Court recognized that its prior attempts to construe "relate to" did not provide much help drawing the line as to what should be preempted. *See id.* at 655, 115 S. Ct. at 1677, 131 L. Ed. 2d at 705. The Court concluded that in order to determine whether the normal presumption against preemption has been overcome in a particular case, it "must go beyond the unhelpful text and the frustrating difficulty of defining [§ 514 (a)'s] key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656, 115 S. Ct. at 1677, 131 L. Ed. 2d at 705. The Court found that the "basic thrust" of the clause was "to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans," and observed that under its past case law it had found ERISA to preempt state laws that mandated employee benefit structures or their administration. *Id.* at 657–58, 115 S. Ct. at 1677-78, 131 L. Ed. 2d at 706. The use of this approach for "connection with" analysis was subsequently endorsed and used by the Court both in *Dillingham* and *De Buono* and recognized by this circuit in *Davies v. Centennial Life Insurance Co.*, 128 F.3d 934 (6th Cir. 1997).[9]

Using the *Travelers* "connection with" analysis, the district court in the case at bar determined that Kentucky's AWP laws had a connection with ERISA plans. The court found that while the law did not operate directly on ERISA plans, it

_____

state law. *See id.*

_____

[9]In changing its "relate to" analysis in *Travelers*, the Court appears to have been addressing only the "connection with" prong, as its statements in later cases indicate the "reference to" prong was unaffected. *See De Buono*, 520 U.S. at 815 n.15, 117 S. Ct. at 1752, 138 L. Ed. 2d at 30; *Dillingham*, 519 U.S. at 324, 117 S. Ct. at 837, 136 L. Ed. 2d at 799.

terms of the policyholder's policies.[10] The only contracts affected are those between the benefit plan and the providers already in the plan network. Kentucky's AWP laws do not *require* that a single doctor be added to any benefit plan network; benefit plans may still maintain provider networks which require doctors to meet certain terms before joining and the plans may still require that policyholders see plan doctors for their medical costs to be covered. *See* Gary A. Francesconi*, Erisa Preemption of "Any Willing Provider" Laws–An Essential Step Toward National Health Care Reform*, 73 Wash. U. L.Q. 227, 248-49 (1995) (observing that with or without the any willing provider law, the insured's access to certain providers is limited by the policy).

While doctors who meet the plans qualifications may independently decide to join the plan and the plan must accept them, many doctors may not meet the plan's qualifications or may have no desire to join that particular plan. For example, in an area with multiple benefit plans, a relatively small percentage of additional qualified doctors may decide to join any particular plan network. In such a scenario, many doctors may already be members of several plan networks and may have no desire to enroll in additional networks. Even those qualified doctors who were previously excluded from all the plans in such an area would be unlikely to join every plan after the AWP law. The result is that although Kentucky's AWP laws make it marginally more likely that a policyholder's benefit plan network will contain their

_____

[10]The majority mysteriously concludes that the provision changes the policy between the insured and insurer, "not in terms of covered medical conditions, but in terms of covered treatment by health care providers." However, both the medical risks and corresponding treatment covered by the insurer remain unaltered by Kentucky's AWP law. Consequently, I assume that by this statement the majority really means that by *potentially* expanding the number of plan doctors that one could go to receive treatment for a covered condition, the AWP law somehow changes the contract between the insurer and insured.

analyzing whether the law fell under the savings clause as a law regulating insurance, the court began by recognizing that:

> Because insurance is the business of spreading risk, *Royal Drug,* 440 U.S. at 205, 99 S. Ct. 1067, a state law that regulates the relationship between a carrier and a provider without affecting the risk borne by the insured is outside the definition of insurance regulation. Id. at 213-214, 99 S. Ct. 1067; *Hahn v. Oregon Physicians Serv.,* 689 F.2d 840, 843-844 (9th Cir. 1982).

*Id.* at 1045. The court concluded, however, that by expanding the kinds of treatment that an insurer must cover to include various types of alternative medicine, the risk that the insured might need alternative medical treatment was shifted to the insurance company. *See Gregoire,* 147 F.3d at 1046. In reaching this conclusion, the court distinguished Washington's mandatory provider law from AWP laws, noting that the mandatory provider statute did not require any carrier to contract or deal with any particular provider; instead it merely forbade a carrier from excluding a particular class of provider. *See Gregoire* 147 F.3d at 1046.[9]

AWP statutes such as Kentucky's are different in purpose and effect than either the mandatory benefit or mandatory provider statutes respectively at issue in *Metropolitan Life* and *Gregoire.* Rather than shifting risk from policyholders to insurers, Kentucky's AWP statutes merely prohibit benefit plans from excluding qualified providers who want to join the plan's provider network and are able to meet the plan's requirements. The risk assumed by the benefit plan under its policy, that the policyholder will require medical treatment, remains unaltered. The statute's passage in no way alters the

---

[9]As to the issue of whether AWP laws spread risk, the *Gregoire* court stated that it expressed no opinion. *Gregoire,* 147 F.3d at 1047.

effectively required benefit plans to purchase benefits of a certain structure, thereby bearing indirectly but substantially on all insured plans. As a result, the court concluded that the AWP statutes did more than just indirectly affect the cost of ERISA plans; the AWP statutes mandated benefit structures.

Two other district courts in Kentucky recently drew the same conclusion while addressing the same statute. In *Community Health Partners, Inc. v. Kentucky,* 14 F. Supp. 2d 991, 1000-01 (W.D. Ky. 1998), the court found Kentucky's AWP provision, located then at § 304.17A-110(3), to be similar in effect to the mandated benefit law in *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985). In *Metropolitan,* the Supreme Court held that the Massachusetts mandated benefit law "related to" ERISA plans because the statute bore indirectly, but substantially, on all insured employee benefit plans by effectively requiring the plans to purchase mental health benefits when purchasing a certain kind of common insurance policy. *See id.* at 739, 105 S. Ct. at 2388, 85 L. Ed. 2d at 740. Similarly, the *Community Health Partners* court believed that the AWP law effectively mandated the benefit structure of ERISA plans and regulated the relationship between traditional ERISA entities, *i.e.,* the plan, the employer, and the plan fiduciaries and beneficiaries. 14 F. Supp. 2d at 997.

A recent memorandum opinion, *Ward v. Alternative Health Delivery Systems, Inc.,* 55 F. Supp. 2d 694 (W.D. Ky. 1999), held that § 304.17A-171, which contains regulations of a health benefit plan's use of chiropractic services, including an AWP provision, was preempted by ERISA due to its connection with employee benefit plans. *Id.* at 701. The judge found that:

> By specifically prohibiting health organizations from offering networks with limited chiropractic providers, the statute mandates the plan's structure. Moreover, the statute also dictates that all covered participants shall have access to the chiropractor of their choice. This too

dictates a certain structure to which an employer's health care plan must succumb. As such this claim also falls within the realm of ERISA preemption.

*Id.* at 699.

Some academic literature has suggested that the Supreme Court's post-*Travelers* case law may represent a "sea change" in the "relation to" analysis; however, neither the Court's nor the circuits' opinions yet confirm this assertion.[10] The two appellate courts that have addressed the issue since *Travelers* both found that the AWP statutes at issue were "connected with" ERISA covered employee benefit plans. *See CIGNA Healthplan of La., Inc. v. Louisiana*, 82 F.3d 642, 648–49 (5th Cir. 1996); *Texas Pharmacy Ass'n v. Prudential Ins. Co. of Am.* 105 F.3d 1035, 1037 (5th Cir. 1997). In both of these cases, the courts recognized that under the reasoning of *Travelers*, state laws that mandate employee benefit structures are preempted. Finding the AWP statutes at issue did exactly that, both courts concluded that they were trumped by ERISA's preemption provision. *Cf. Stuart Circle Hosp. Corp. v. Aetna Health Management*, 995 F.2d 500, 502 (4th Cir. 1993) (finding, in a case prior to *Travelers,* that Virginia's AWP statute related to ERISA covered employee benefit plans because it eliminated an insurer's ability to choose limited provider networks).

We are convinced that even after the change of emphasis worked by *Travelers* on the "connection with" prong of the Supreme Court's "relation to" preemption analysis, the district court in this case was correct in finding that former § 304.17A-110(3) (now § 304.17A-270) and present

---

[10]While Justice Scalia has suggested that the Court should really be applying field preemption, rather than the express preemption test it has created for analyzing ERISA's preemption provisions, *Dillingham*, 519 U.S. at 335-36, 117 S. Ct. at 843, 136 L. Ed. 2d at 806 (1997) (Scalia, J., concurring), absent further direction from the whole Court on this issue we must continue to apply the traditional analysis.

conclusion because it believed the laws were similar to the mandated benefit laws that the Supreme Court found to spread risk in *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985). According to the district court, risk was spread because Kentucky's AWP laws made it more likely that an insurer would cover a visit to a provider that the policyholder may have paid to visit on his or her own, due to the policyholder's preference for that particular provider.

I disagree with the district court's attenuated risk spreading analysis and find its analogy to *Metropolitan Life* to be misplaced. *Metropolitan Life* involved a Massachusetts law which required insurers to provide certain minimum mental health benefits to Massachusetts residents. *Id.* at 724, 105 S. Ct. 2380. While applying the McCarran-Ferguson factors to the Massachusetts law, the Supreme Court concluded that risk was being spread because the statute was intended "to effectuate the legislative judgment that the risk of mental-health care should be shared." *Id.* at 743, 105 S. Ct. 2391.

Mandated benefit laws like the one at issue in *Metropolitan Life* require an insurer to treat individuals with health care conditions that may not have been covered before the law. The effect of such laws is to shift a significant degree of risk from individuals who originally had no such coverage under the insurance policy, to the insurer. Although a closer question, the same can likely be said for mandated provider laws. Under such laws, an insurance company must provide coverage for treatment from any category of provider,[8] which typically broadens insurance coverage to include forms of alternative medicine (e.g., chiropractic, massage therapy, acupuncture) not previously covered under the policy. The Ninth Circuit confronted such a law in *Washington Physicians Serv. Ass'n v. Gregoire*, 147 F.3d 1039 (1998). In

---

[8]The insurance company's ability to use limited provided networks remains unaffected by such a law.

result, I must conclude that §§ 304.17A-110(3) and 304.17A-171(2) do *not* "satisfy the commonsense view as . . . regulation[s] that hone in on the insurance industry" but rather the provisions "just have an impact on [that] industry." *See Ward*, 119 S. Ct. at 1387 (quoting *Pilot Life*, 481 U.S., at 50, 107 S.Ct. at 1554).

### B.

Next I "consider [the] three factors employed to determine whether the regulation fits within the 'business of insurance' as that phrase is used in the McCarran-Ferguson Act:  first whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Ward*, 119 S.Ct. at 1386 (internal citations and quotations omitted).   The McCarran-Ferguson factors only serve to reinforce my conclusion that Kentucky's AWP laws are not saved from preemption by ERISA § 514(b).    While none of the McCarran-Ferguson factors should be seen as dispositive, they provide helpful guideposts for savings clause analysis, lending depth and guidance to the common sense test, particularly in difficult cases such as the one we are presented with. *See Ward* 119 S. Ct. at 1389.  With this understanding I begin by considering whether Kentucky's AWP laws have the effect of transferring or spreading policyholder risk.

Appellees argue, and the majority agrees, that the district court was correct in finding that Kentucky's AWP laws spread policyholder risk.   The district court reached this

---

reason that the AWP laws would not apply.  A plain reading of the AWP provision compels this conclusion regardless of the law's applicability to the self-insured entity the HMO or HSC contracted with.  Consequently, one can only conclude that the AWP provisions are preempted, as by their terms they apply directly to HMO's and HSC's that have merely agreed to operate as administrators of self-insured employee benefit plans.

---

§ 304.17A-171 were both "connected with" ERISA covered plans.   They not only affect the benefits available by increasing the potential providers, they directly affect the administration of the plans.

The Kentucky statutes in question meet both prongs of the "relation to" analysis and thus are preempted, unless found to be statutes that regulate insurance under the savings clause of § 514(b) (2)(A).

### III.  Insurance Savings Clause

Having concluded that Kentucky's AWP laws relate to ERISA covered employee benefit plans, and are thus within the scope of ERISA's preemption provision, the Court must then determine whether the laws fall within ERISA's savings clause.  The savings clause states that, "[e]xcept as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or securities." ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A).  This provision provides a broad and important exception to ERISA's preemption provision, saving state laws that relate to ERISA plans from preemption so long as they "regulate insurance."    Much like the preemption provision itself, however, the scope of the savings clause has proved difficult to determine from its sparse language.[11]

---

[11]*See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739-40, 105 S. Ct. 2380, 2389, 85 L. Ed. 2d 728, 740 (1985), in which the Court stated:

[T]he sphere in which § 514(a) operates was explicitly limited by § 514(b)(2).  The insurance savings clause preserves any state law "which regulates insurance, banking, or securities." The two pre-emption sections, while clear enough on their faces, perhaps are not a model of legislative drafting, for while the general preemption clause broadly pre-empts state law, the saving clause appears broadly to preserve the States' lawmaking power over much of the same regulation.  While Congress occasionally decides to return to the States what it has previously

The Supreme Court has endeavored to provide guidance on what it means to "regulate insurance," first addressing the issue in *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985), and most recently describing the test in *UNUM Life Insurance of America v. Ward*, 526 U.S. 358, 119 S. Ct. 1380, 143 L. Ed. 2d 462 (1999), stating:

> Our precedent provides a framework for resolving whether a state law "regulates insurance" within the meaning of the saving clause. First we ask whether, from a "common sense view of the matter," the contested prescription regulates insurance. Second, we consider three factors employed to determine whether the regulation fits within the "business of insurance" as that phrase is used in the McCarran-Ferguson Act: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." (internal citations omitted).

*Ward,* 526 U.S. at 367-68, 119 S. Ct. at 1386, 143 L. Ed. 2d at 472.

The Court noted that the three McCarran-Ferguson factors are "'considerations [to be] weighed' in determining whether a state law regulates insurance" and that "[n]one of these criteria is necessarily determinative in itself." *See id.* at 373, 119 S. Ct. at 1389, 143 L. Ed. 2d at 476. Therefore, in determining whether Kentucky's AWP laws are saved from preemption by ERISA § 514(b)(2)(A), one must first ask whether as a matter of common sense they regulate insurance,

---

taken away, it does not normally do both at the same time.

to" employee benefit plans. However, having concluded that the *entire* AWP provision is preempted, the majority fails to apply savings clause analysis to the *entire* AWP provision. As I have discussed, Kentucky's law, by its very terms, does attempt to regulate entities outside the insurance industry, through its regulation of HMO and HSC and Insurance Company contracts, which would include contracts purely for plan administration. The majority attempts to ignore this fact by summarily concluding that the law would not apply to plan administrators. However, in doing so the majority is apparently saying that the law is clearly preempted and not saved insofar as it applies to plan administrators, and then arguing that due to this preemption, the statute does not apply to entities outside the insurance industry. The majority cites no authority for its attempt to dissect Kentucky's AWP provisions, dismissing some of the provision's applications as preempted and then applying saving clause analysis only to those applications it wishes to retain. In applying the common sense test we should be looking at the whole provision, not determining whether portions of a provision are saved in some, but not all scenarios.

In sum, unlike *Ward*, where the notice-prejudice rule was by its very terms "directed specifically at the insurance industry and [was] applicable only to insurance contracts," 119 S. Ct. at 1386, Kentucky's AWP laws clearly apply to entities and contracts outside the insurance industry.[7] As a

---

[7]In an attempt to dismiss the problem of partial preemption (insofar as applied only to plan administrators), the majority appears to draw a distinction between Kentucky's AWP statute and the AWP statute at issue in *Prudential Ins. Co.*, on the grounds that Kentucky's statute does not specifically state that it applies to "plan administrators." However, §§ 304.17A-110(3) and 304.17A-171(2) apply to "Health Benefit Plans," defined to include HMO and HSC contracts. Similarly, § 304.17A-270 applies to "Health Insurers," defined to include all Insurance Companies, HMOs and HSCs. These definitions in no way limit the applicability of Kentucky's AWP provisions to entities underwriting risk. Consequently, if a self-insurer entered into a contract with an HMO, HSC, or Insurance Company solely for the provision of plan administration, there is no

Blue Shield, which provided plan administration services for a self-insured employee benefit plan, were not engaged in the business of insurance and therefore that the state mandated benefit laws were preempted with respect to not only the underlying self-insured plan, but also the plan administrators).

*Light*, however, is inapposite to the proposition the majority ultimately seeks to advance, that is, if Kentucky's AWP law does not apply to self-insurers, *a fortiori*, it also does not apply to entities administering the self-insured plan. The employee benefit plan at issue in *Light* contained a provision stating that "the contracts between South Central Bell and the plan administrator necessarily will conform to applicable state laws." *Id*. at 465. Plaintiffs argued that since the plan adopted state law, the plan administrator was required to comply with that law. The Fifth Circuit began by noting that if ERISA preempted state law, there would be no state law for the administrator to conform to. The court then turned to Plaintiffs' argument that the preemption provision of 29 U.S.C. § 1144(a) should not be read to apply to plan administrators. Plaintiffs asserted that because their action was against a plan administrator, it did not relate to an employee benefit plan, and therefore was not preempted. The court found no merit in plaintiffs' argument because, "[a]bsent ERISA the state common law on which [plaintiffs] rely would provide causes of action for the improper handling of claims under benefit plans," giving the law a "direct connection" with employee benefit plans. *Id*. at 1249. As a consequence, the court found § 1144 preempted plaintiffs' state causes of action with respect to the administrator of their self-insured plan as well. *Id*.

In the case at bar, the majority states that based in part on reliance on *Light*, it does not believe that Kentucky's AWP law could be enforced against plan administrators of self-insured plans. The majority appears to arrive at this conclusion due to its belief that, as in *Light*, Kentucky's AWP statute would be preempted insofar as it applies to plan administrators, given that Kentucky's AWP statute "relates

and then look to the McCarran-Ferguson factors as checking points or guideposts to aid the analysis.

In *Ward*, the Court was faced with the question of whether California's notice-prejudice rule[12] was preempted by ERISA. The parties had agreed that California's notice-prejudice rule "related to" ERISA covered plans under § 514(a), so the Court had only to determine whether the rule was saved by the insurance regulation savings clause of § 514(b)(2)(A). 526 U.S. at 367, 119 S. Ct. at 1386, 143 L. Ed. 2d at 472. The Court began with the common sense prong of its insurance regulation savings clause test, observing that:

> The California notice-prejudice rule controls the terms of the insurance relationship by "requiring the insurer to prove prejudice before enforcing proof-of-claim requirements." *Cisneros*, 134 F.3d at 945. As the Ninth Circuit observed, the rule, by its very terms, "is directed specifically at the insurance industry and is applicable only to insurance contracts." *Ibid.*; see Brief for United States as Amicus Curiae 12 ("[O]ur survey of California law reveals no cases where the state courts apply the notice-prejudice rule as such outside the insurance area. Nor is this surprising, given that the rule is stated in terms of prejudice to an 'insurer' resulting from untimeliness of notice."). The rule thus appears to satisfy the common-sense view as a regulation that homes in on the insurance industry and does "not just have an impact on [that] industry." *Pilot Life*, 481 U.S. at 50, 107 S. Ct. 1549.

---

[12]The rule states, "a defense based on an insured's failure to give timely notice [of a claim] requires the insurer to prove that it suffered actual prejudice. Prejudice is not presumed from delayed notice alone. The insurer must show actual prejudice, not the mere possibility of prejudice." *Ward*, 526 U.S. at 366-67, 119 S. Ct. at 1386, 143 L. Ed. 2d at 472.

*Ward*, 526 U.S. at 368, 119 S. Ct. at 1386-87, 143 L. Ed. 2d at 472-73.

*Ward* makes it clear that the most important aspect of the test is whether from a common sense view of the matter the contested statute regulates insurance. The three McCarran-Ferguson factors are of secondary importance, serving only as "checking points" or "guideposts" and not as essential elements. Indeed, in *Ward*, the Court ignored the first McCarran-Ferguson factor altogether in its analysis of the challenged statute in that case.

The Kentucky Act meets the common sense test in that it clearly does regulate insurance. The fact that it includes within its reach HMOs as well as traditional insurance companies does not take it out of the realm of insurance regulation. We agree with the reasoning of the Ninth Circuit in *Washington Physicians Service Association v. Gregoire*, 147 F.3d 1039 (9th Cir. 1998), in which the Court said:

> The Washington law is "specifically directed" toward the insurance industry, *Pilot Life*, 481 U.S. at 50, 107 S.Ct. 1549, because it operates directly on HMOs and HCSCs, entities that are engaged in the business of health insurance. "The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211, 99 S.Ct. 1067, 59 L. Ed.2d 261 (1979), citing 1 G. Couch, Cyclopedia of Insurance Law § 1:3 (2d ed.1959)("It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it."). The only distinction between an HMO (or HCSC) and a traditional insurer is that the HMO provides medical services directly, while a traditional insurer does so indirectly by paying for the service, *Anderson v. Humana, Inc.*, 24 F.3d 889, 890 (7th Cir. 1994), but this

within the insurance industry, in part because it applied to "health care financiers, third party administrators, providers, or other intermediaries"). The only risk underwritten is that accepted by the ERISA self-insured plan, which under the "deemer clause" of ERISA § 514 (b)(2)(B), 29 U.S.C. § 1144(b)(2)(B), cannot be treated as an insurance company for the purposes of state regulation. *See FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S. Ct. 403, 409, 112 L. Ed. 2d 356 (1990); *Texas Pharmacy Ass'n*, 105 F.3d at 1039. The common sense conclusion that can be drawn from the AWP statute's coverage of entities clearly operating outside of the business of insurance is that the statute is concerned generally with regulating provider access to networks rather than specifically regulating the business of insurance.[6] *See Prudential Ins. Co.*, 154 F.3d at 829 (concluding that the AWP law at issue was "not a law directed at the insurance industry at all, but a law directed at regulation of broadly defined health benefit plans, only some of which fall within the insurance industry").

The majority seeks to refute this conclusion by arguing that Kentucky's AWP law would not apply to entities performing only plan administration for self insurers, apparently on the grounds that to the extent that Kentucky's AWP law seeks to do so, they would be preempted by ERISA. In support the majority cites *Light v. Blue Cross and Blue Shield of Alabama, Inc.*, 790 F.2d 1247, 1248 (5th Cir.1986), which holds that state laws which apply to administrators of self insured plans may be preempted by ERISA and "if ERISA preempts state law, there is no applicable state law to which the administrator must conform." Other courts have drawn a similarly unremarkable conclusion. *See Insurance Bd. Under Social Ins. Plan of Bethlehem Steel Corp. v. Muir,* 819 F.2d 408, 410–13 (3d Cir. 1987) (concluding that Blue Cross and

---

[6] The fact that §§ 304.17A-110(3) and 304.17A-171(2) happen to be codified amongst Kentucky's insurance provisions does not alter this conclusion, as it in no way assures that the law is specifically directed toward the insurance industry.

there very terms, prohibit *all* HMO's, HSC's and Insurance Companies from "discriminat[ing] against any provider who is located within the geographic coverage area of the health benefit plan . . . ." *See* §§ 304.17A-110(3) and 304.17A-171. The AWP laws would clearly apply to HMOs, HSCs, or Insurance Companies providing plan administration services, as there is nothing in the statute that would exclude them in such a scenario.

Although HMOs, HSCs, and Insurance Companies may accept risk in some situations, as third party administrators they would merely be contracting to handle paperwork and plan administration for a self-insured ERISA plan. While handling such administrative duties, however, these entities would be forced by Kentucky's AWP laws to accept any willing provider into the plan, even though they were not underwriting any risk. The law in this instance is not directed at the business of insurance, as no insurance is involved. *See Prudential Ins. Co.*, 154 F.3d at 829 (observing that the Arkansas AWP statute at issue defined health benefit plans so broadly as to include plan administrators and thus did not fit within a common sense view of a law directed specifically toward the insurance industry); *Texas Pharmacy Ass'n v. Prudential Ins. Co. of America*, 105 F.3d 1035, 1039 (5th Cir. 1997) (noting that a self-insured employer would not be subject to Texas' AWP statute, "but if the employer signed up with an HMO or PPO, those organizations would be subject to the statute, even if there is no insurance involved"); *Cigna Health Plan of La., Inc.* 82 F.3d at 649 (concluding that Louisiana's AWP law was obviously not limited to entities

insurance business in Kentucky. Ky. Rev. Stat. Ann. § 304.17A-005 (Banks-Baldwin 1999). This definition largely tracks repealed § 304.17A-100(4)(a)'s definition of "Health Benefit Plan." Despite the majority's claim that the substitution of the term "Health Insurer" for "Health Benefit Plan" in the current statute excludes administrators under contract with benefits plans from the scope of the statutes, the definition of "insurer" continues to include plan administrators.

is a distinction without a difference. *Metropolitan Life*, 471 U.S. at 741, 105 S. Ct. 2380 (explaining that nothing in ERISA "purports to distinguish between traditional and innovative insurance laws"); *Klamath-Lake Pharmaceutical Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1286-87 (9th Cir. 1983). In the end, HMOs function the same way as a traditional health insurer: The policyholder pays a fee for a promise of medical services in the event that he should need them. It follows that HMOs (and HCSCs) are in the business of insurance.

*Id.* at 1045-46.[13] In *Anderson v. Humana, Inc.*, 24 F.3d 889, 892 (7th Cir. 1994), the court said: "Because HMOs spread risk – both across patients and over time for any given person – they are insurance vehicles under Illinois law." They are likewise "insurance vehicles" under Kentucky law.

It is true that the statutes would reach certain self-insured health care benefit plans that are not under ERISA's protective "deemer" clause, *e.g.,* self-insured government plans and self-insured church plans, because they are excluded entirely from ERISA's coverage under 29 U.S.C. § 1003(b). We do not see this fact, however, as any barrier to a finding that a common sense view is that the statutes regulate insurance. We know of no reason why it is not within the authority of a state in enacting laws dealing with insurance to include within such laws entities that act as self-insurers as well as entities who purchase insurance. As the author of a well-known treatise has said, "Self-insurance has often led courts and legislatures to struggle with the intriguing question of whether a party who has not purchased insurance, effectively acting as its own insurer, should be the equivalent

[13]As noted earlier, the Ninth Circuit in *Gregoire* found that the Washington statute did not come within the scope of ERISA's pre-emption clause. Nevertheless, the Court found that, even if it did, the statute dealt with the regulation of insurance and would therefore be saved from pre-emption.

of an insurer." 1 COUCH ON INSURANCE 3d § 10.2. It is pointed out that this difficulty in modern practice is frequently removed by express statutory provisions specifying that a particular requirement does or does not apply to self-insured entities. *Id.* Kentucky has done this by expressly including self-insurers — to the extent permitted by ERISA — within the coverage of the statutes in question.

The state's regulation of health benefit plans is set forth in Kentucky's Insurance Code (Chapter 304 of Title XXV dealing with Business and Financial Institutions). Subtitle 17A of the Insurance Code deals with health insurers and health benefit plans. Section 304.17A-005 contains the definition of words used in that subtitle. Paragraph 22 provides:

> "Insurer" means any insurance company; health maintenance organization; self-insurer or multiple employer welfare arrangement not exempt from state regulation by ERISA; provider-sponsored integrated health delivery network; self-insured employer-organized association, or nonprofit hospital, medical-surgical, dental, or health service corporation authorized to transact health insurance business in Kentucky.

"Health benefit plan" is also defined, the relevant portion of that definition tracking the above definition of "insurer:"

> "Health benefit plan" means any hospital or medical expense policy or certificate; nonprofit hospital, medical-surgical, and health service corporation contract or certificate; provider sponsored integrated health delivery network; a self-insured plan or a plan provided by a multiple employer welfare arrangement, to the extent permitted by ERISA; health maintenance organization contract; . . .

Ky. Rev. Stat. Ann. § 304.17A-005(17).

due to mootness after the Alabama Supreme Court determined in a certified question that the law at issue did not apply to plaintiff); *Stuart Circle*, 995 F.2d at 503–04 (concluding that the AWP statute at issue, which *only* applied to insurance companies actively issuing insurance policies, met the common sense test as a law regulating insurance).

Significantly, the AWP provisions also apply to third parties that a self-insured ERISA plan hires to administer its plan benefits. As used in §§ 304.17A-110(3) and 304.17A-171, "health benefit plan" also includes Hospital, Health Service Corporation, and HMO contracts.[4] Section 304.17A-270 uses the term "Health Insurer" instead of "Health Benefit Plan," but similarly defines it to include any Insurance Company, HMO, or HSC.[5] Thus, Kentucky's AWP laws, by

---

[4] Section 304.17A-100(4)(a) defined "Health Benefit Plan" as including:
> Any hospital or medical expense policy or certificate; nonprofit hospital, medical-surgical, and health service corporation contract or certificate; a health benefit plan offered by a provider-sponsored integrated health delivery network; a self-insured plan or a plan provided by a multiple employer welfare arrangement, to the extent permitted by ERISA; health maintenance organization contract; and standard and supplemental health benefit plan as established by KRS 304.17A-160.

Ky. Rev. Stat. Ann. § 304.17A-100(4)(a). Section 304.17A-170 supplies a nearly identical definition of "Health Benefit Plan" (by reference to § 304.17A-005) for § 304.17A-171.

[5] As observed in part I of the majority opinion, § 304.17A-270 recodified § 304.17A-110(3), merely substituting "Health Insurer" for "Health Benefit Plan," and leaving the AWP provision otherwise unchanged. Section 304.17A-005 defines "Insurer," as used in § 304.17A-270, as:
> [A]ny insurance company; health maintenance organization; self-insurer or multiple employer welfare arrangement not exempt from state regulation by ERISA; provider sponsored integrated health delivery network; self-insured employer organized association, or nonprofit hospital medical-surgical, dental, or health service corporation authorized to transact health

Kentucky's AWP laws apply to non-ERISA covered self-insured plans by defining health benefit plans to include "a self-insured plan . . . to the extent permitted by ERISA." §§ 304.17A-100(4)(a) and 304.17A-170(1). This definition includes self-insured plans not regulated by ERISA, such as government plans and church plans, which ERISA excludes from its coverage. *See* 29 U.S.C. § 1003 (b). The result is that these self-insured plans, which, as a matter of common sense ought to be considered as operating outside the insurance industry, are subject to Kentucky's AWP laws. *C.f. Cigna Health Plan of La., Inc. v. Louisiana,* 82 F.3d 642, 649 (5th Cir. 1996) (concluding that the statute was not saved as an insurance regulation because it was not limited to entities in the insurance industry as it applied to entities such as self-funded organizations, Taft-Hartley Trusts, or employers who establish and participate in self-funded trusts or programs as well as various intermediaries); *Blue Cross & Blue Shield of Alabama v. Neilsen*, 917 F. Supp. 1532, 1538–39 (N.D. Ala. 1996) (holding that Alabama's AWP statutes did not regulate insurance as a matter of common sense because they applied to all employee benefit plans, including self-funded plans, and were thus not specifically directed toward the insurance industry) (vacated in part on appeal by *Blue Cross & Blue Shield of Alabama v. Neilsen*, 142 F.3d 1375 (11th Cir. 1998)

---

medical services in exchange for a fee. *See Group Life & Health Ins. v. Royal Drug*, 440 U.S. 205, 211, 99 S. Ct. 1067, 1073, 59 L. Ed. 2d 261 (1979) (stating that, "[t]he primary elements of an insurance contract are the spreading and underwriting of policyholder risk"). As such, they may be seen as underwriting policyholder risk and then covering that risk with the provision of medical services, rather than by paying for those services as a traditional insurer would. Given the somewhat subtle distinction in this difference, it could be argued that some HMO's and HSC's are engaged in the business of insurance. *See Washington Physicians Serv. Ass'n v. Gregoire*, 147 F.3d at 1045 (adopting this view); *but see Texas Pharmacy Ass'n*, 105 F.3d at 1038–39 (concluding that the Texas statute was not limited to entities within the insurance industry, as it applied to entities such as HMO's and PPO's). However, as Kentucky's AWP laws also apply to entities that are clearly outside the business of insurance, I believe that it is unnecessary for us to decide this issue.

The AWP provision of Kentucky's Insurance Code specifically is directed at "insurers" by providing that:

A *health insurer* shall not discriminate against any provider who is located within the geographic coverage area of the health benefit plan and who is willing to meet the terms and conditions for participation established by the health insurer, including the Kentucky State Medicaid program and Medicaid partnerships (emphasis added).

Ky. Rev. Stat. Ann. § 304.17A-270.

The chiropractic AWP provision specifically adopts the definition of a health benefit plan as set forth in Kentucky Revised Statutes Annotated § 304.17A-005 and defines "health care insurer" as any entity "authorized by the state of Kentucky to offer or provide health benefit plans, policies, subscriber contracts, or any other contracts of similar nature which indemnify or compensate health care providers for the provision of health care services." Ky. Rev. Stat. Ann. § 304.17A-170(7).

The Kentucky AWP laws are thus specifically directed toward "insurers" and the insurance industry and are ones that from a "common sense view" regulate insurance.

The fact that the deemer clause prevents ERISA self-insured plans from being considered as engaging in the business of insurance does not mean that self-insured plans, by their nature, do not involve the business of insurance and are beyond the reach of state regulations dealing with insurance. The distinction between plans funded by the purchase of insurance and plans that are funded by employers as self-insured plans results from "a distinction created by Congress in the 'deemer clause,' a distinction Congress is aware of and one it has chosen not to alter." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. at 747, 105 S. Ct. at 2393, 85 L. Ed. 2d at 745. It is not a distinction based upon a concept that employers who choose to be self-insurers cannot be considered insurers subject to state regulations

dealing with insurance. Therefore, the fact that the Kentucky statute reaches self-insurers who are not protected by ERISA's deemer clause does not detract from its characterization as a statute regulating entities engaged in the business of health insurance.

As noted earlier, the Kentucky statutes exclude from their scope self-insured ERISA plans. If such a plan provides for a limited group of providers, the AWP laws would not compel a change in that plan, regardless of the nature of the entity administering the plan. It could not be enforced, in our opinion, against the employer who has a self-insured ERISA plan nor against the administrator of such a plan, even if the administrator is an entity, such as an HMO, which would be subject to the statute if it were acting not as a mere administrator but as an insurer of its own plan. In *Light v. Blue Cross and Blue Shield*, 790 F.2d 1247 (5th Cir.1986), the court rejected the argument that a state law could be enforced against the administrator of a self-insured ERISA plan because the deemer clause, § 514(b)(2)(B), which protects such plans from state regulation, does not expressly include plan administrators among the exempted entities. The court found the fact that administrators of self-insured plans are not mentioned in the deemer clause to be of no significance, and because the state law was preempted, the claim against the administrator of the plan based on that law could not be brought, even though the plan itself provided that the contracts between the employer and the plan administrator would "conform to applicable state laws." The court observed that, "If ERISA preempts state law, there is no applicable state law to which the administrator must conform." *Id.* at 1248.

In *Prudential Insurance Company of America v. National Park Medical Center, Inc.*, 154 F.3d 812 (8th Cir. 1998), the court found that an Arkansas statute that contained an AWP provision did not meet the common sense test because, in part, its scope included "employers and administrators of self-insured plans" (although the statute excluded ERISA self-

time analyzing the McCarran-Ferguson factors, which significantly overlap the common sense test, being designed largely to guide a court's common sense determination. *See Unum Life Ins. of Am. v. Ward*, 119 S. Ct. 1380, 1389 143 L. Ed. 2d 462 (1999).

As the Supreme Court has generally started its savings clause analysis with the common sense test, I begin there as well. *See id.* at 1386*; See also Davies* 128 F.3d 940-941 (6th Cir. 1997). In doing so, I conclude that the Kentucky AWP laws do not meet the common sense test because they are directed at the contracts between benefit plans and third parties, rather than being specifically directed at the insurance industry. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987) (concluding that to fall within the savings clause a law must be *specifically* directed at the insurance industry, which in part requires that the law define the terms of the relationship between the insurer and the insured, rather than the insurer and a third party). The laws do not change the relationship between the insurer and insureds, as the same medical conditions are covered after the AWP laws as were insured before the passage of these provisions. The underwriting of risk, the traditional earmark of insurance, *see Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211-12, 99 S. Ct. 1067, 1073-74, 59 L. Ed. 2d 261 (1979), is in no way affected. Insureds are not free to attend the provider of their choice, as the AWP laws merely require employee benefit plans to accept previously excluded doctors that are qualified, willing to join the plan, and agree to abide by its terms.

Contrary to the majority's assertions, I believe it is also apparent that Kentucky's AWP laws clearly target more than just members of the insurance industry.[3] By their terms,

---

[3]In addition to traditional insurance companies, Kentucky's AWP laws apply to entities such as HMO's and Health Service Corporations. These entities *might* be argued to fall within the insurance industry *if* they have agreed to accept the risk that the covered individual will need

---

### DISSENT

---

KENNEDY, Circuit Judge, dissenting. I write separately with respect to Part III of the majority's opinion to dissent from the majority's conclusion that Ky. Rev. Stat. Ann. §§ 304.17A-270[1] and 304.17A-171(2) (Banks-Baldwin 1995) fall within ERISA's insurance savings clause. I believe that Kentucky's any willing provider laws have little to do with insurance and are not saved from preemption by ERISA's Insurance Savings Clause as they do not regulate insurance as a matter of common sense and fail all three of the McCarran-Ferguson factors.

### I. Insurance Savings Clause

### A.

The district court in the case at bar devoted only a sentence to the common sense test, merely concluding that, "the common-sense view is that the AWP statutes regulate the business of insurance."[2] Instead the court spent most of its

---

[1] As noted in the majority's opinion, § 304.17A-110(3) was the provision that was actually before the district court. However, both the parties have agreed that this appeal will govern § 304.17A-270 as well, as it is essentially a recodification of § 304.17A-110(3). Accordingly, unless otherwise noted I would apply my analysis of § 304.17A-110(3) to § 304.17A-270 as well.

[2] The district court in the companion case of *Community Health Partners, Inc. v. Commonwealth of Kentucky*, 14 F. Supp. 2d 991 (1998) devoted more room to its discussion of the common sense test. The court concluded that the statute satisfied the common sense test because it affected specific terms of the insurance policy, was located in the insurance code and regulated insurers or insurer related entities. *Id.* at 1001-02. While the district court conducted a careful analysis, I reach a contrary conclusion on all points for the reasons explained below.

funded plans). As noted above, however, we do not believe that inclusion of self-insurers not protected by the deemer clause, as well as purchasers of insurance, within the statute's reach in itself removes the statute from being viewed a permissible regulation of insurance based upon "a common understanding of insurance regulation." Also, unlike the Arkansas statute, the Kentucky statutes do not include "administrators of self-insured plans." They are directed towards and limited to health care "insurers."[14]

---

[14] The dissent contends that Kentucky's AWP provisions apply to third parties that a self-insured ERISA plan hires to administer its plan benefits. This contention, however, is based upon the dissent's reading of the repealed Kentucky statutes which prohibited "health care benefit plans" from discrimination and defined health benefit plans as including a health service corporation contract and a health maintenance organization contract. The present Kentucky statutes eliminate any ambiguity as to whether administrators under contracts with benefit plans are included within the scope of the statutes. They obviously are not. The current Kentucky statute prohibits *only* "a health *insurer*" from discrimination. Ky. Rev. Stat. Ann. § 304.17A-270. As the defendant correctly notes, "the new statute refers to health insurers which shall not discriminate among providers rather than health care benefit plans which strengthens Appellee's arguments that the AWP law regulates insurance." Brief of Defendant-Appellee, p. 3 n.5. An entity that merely administers a plan for a health insurer and does not participate in the underwriting of the risk is not an "insurer" and is not within the scope of Kentucky's current statutes which are, by their express terms, directed solely at health *insurers*. This is acknowledged by the defendant:

> The statutes establish that health insurers, which assume financial risk, cannot discriminate against qualified providers. Therefore, although the statute tenuously affects the relationship between insurers and providers, its focus is on the contractual relationship between the insurer and the insured.

> Brief of Defendant-Appellee, p. 18.

Thus, under the current AWP statute, the insurer of a plan, including a self-insurer of a non-ERISA benefit plan, must not discriminate against qualified providers, and any health benefit plan of such insurer must conform to the statute. While not included as an entity subject to the statute, a plan administrator would necessarily be required to comply with

*Texas Pharmacy Association v. Prudential Insurance Company of America*, 105 F.3d 1035 (5th Cir. 1997), contains the statement that if a self-insured employer, not subject to the any willing provider statute, "signed up with an HMO or PPO, those organizations would be subject to the statute, even if there is no insurance company involved." *Id.* at 1039. The court was presumably referring to the HMO or PPO acting as the administrator of the employer's self-funded plan. We believe, however, that, as the court in *Light* observed, if ERISA preempts the state law with respect to self-funded plans, there is no state law to which the administrator of the self-funded plan must conform. Furthermore, as previously noted, the Kentucky statute is directed toward and applies to only insurers and not to plan administrators. *Supra*, note 14. A plan administrator that does nothing more than administer the plan of a self-insured employer is not engaged in "the underwriting and  spreading of risk," *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205,  221, 99 S. Ct. 1067, 1077, 59 L. Ed. 2d 261, 274 (1979), and in our view, would not be considered an "insurer" of a health benefit plan as that term is used in Kentucky's AWP laws.[15]

the plan's non-discriminatory requirement.  With respect to self-insured ERISA benefit plans, the insurer of such plans is beyond the scope of the statute by its express terms, and the administrators of such plans who act solely as administrators and not as insurers are likewise beyond the scope of the statute because of its application only to health insurers.

[15]The dissent believes that the majority is "apparently saying that the law is clearly preempted and not saved insofar as it applies to plan administrators, and then arguing that due to this preemption, the statute does not apply to entities outside the insurance industry."  According to the dissent, this is an "attempt to dissect Kentucky's AWP provisions, dismissing some of the provision's applications as preempted and then applying saving clause analysis only to those applications it wishes to retain."  This is a misreading of the majority opinion.  The majority does not say that the Kentucky statutes are preempted insofar as plan administrators are concerned.  The majority is saying that insofar as self-insured ERISA plans are concerned, the Kentucky AWP laws could not be enforced against a plan administrator, as a matter of law, under the reasoning of *Light*, because if the law is preempted with respect to self-

Kentucky AWP laws in question regulate insurance. We conclude, as did the two Kentucky District Judges who carefully considered this question, that they do.

### IV. Conclusion

With respect to Kentucky's AWP statute, Kentucky Revised Statutes Annotated § 304.17A-270 (Banks-Baldwin 1999), and Kentucky's chiropractic AWP statute, Kentucky Revised Statutes Annotated § 304.17A-171(2) (Banks-Baldwin 1999), the judgment of the district court is affirmed. Because the district court opinion does not discuss the additional requirements imposed by  provisions (1) and (3)-(8) of § 304.17A-171, dealing with chiropractors and health benefit plans, this case is remanded to the district court for consideration in the first instance of the issue of their preemption by ERISA.[21]

[21]Having concluded that Kentucky's AWP statutes are valid, there is no reason for the majority opinion to discuss any question of severability.  The dissent, however, in discussing the question of severability, states that the majority "fails to mention, let alone discuss, how it severs Kentucky's AWP provision in such a manner that it no longer applies to third party plan administrators performing administrative functions for self-insured plans, thereby allowing it to conclude that the provision is saved in all other applications."  As noted earlier, *supra*, note 15, this is a misreading of the majority opinion.  The majority does not hold that the AWP statutes are preempted as applied to administrators of ERISA self-insured plans.  It holds, instead, that because the statutes exclude ERISA self-insured plans, they could not be applied against an administrator of such plans under the reasoning of *Light* and, more importantly, they prohibit only health *insurers* from discrimination and, therefore, exclude entities that act solely as administrators of the insurer's health benefit plan.

insurance industry. To hold otherwise would require the Court to recognize form over substance and to refuse to recognize the natural evolution of the health insurance industry. *Cf. SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 71, 79 S. Ct. 618, 3 L. Ed. 2d 640 (1959) (We realize that life insurance is an evolving institution. Common knowledge tells us that the forms have greatly changed even in a generation. And we would not undertake to freeze the concepts of "insurance". . . into the mold they fitted when these Federal Acts were passed.)

14 F. Supp. 2d at 1003-04.[20]

It must be reiterated and emphasized that the three McCarran-Ferguson factors are not required to be satisfied before a state law can be found to be a law regulating insurance. They are, as the Supreme Court pointed out in *Ward*, nothing more than "checking points" or "guideposts." The basic test is whether, from a common sense view, the

---

[20]In *American Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.*, 973 F. Supp. 60 (D. Mass. 1997), a Massachusetts AWP statute, unlike the Kentucky AWP laws, did not exclude ERISA self-insured plans from its coverage. Because such plans are not insurers under the "deemer" clause, the argument was made that the state statute was not directed specifically toward the insurance industry. In rejecting this argument, the court noted that, with reference to ERISA self-insured plans, "any decision holding that the Act is saved from preemption by the insurance saving clause would have to recognize that the Act could not apply to the provision of services to self-insured plans. Because the Act would not apply to these uninsured relationships, it is unnecessary to consider whether the Act would lose its status as an insurance regulation because it purports to cover these relationships." *Id.* at 71 n.9. The court also pointed out that in *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985), the fact that the state statute "applied by its terms to self-insured plans did not prevent the Supreme Court from concluding that the statute was limited to the insurance industry. Instead, the deemer clause simply prevented application of the statute to self-insured plans." *Id.* (internal citations omitted).

---

In *Metropolitan Life*, 471 U.S. at 743-44, 105 S. Ct. at 2391, 85 L. Ed. 2d at 743, the Supreme Court said:

Congress was concerned [in the McCarran-Ferguson Act] with the type of state regulation that centers around the contract of insurance.... The relationship between insurer and insured, the type of policy which could be issued, its reliability, its interpretation, and enforcement – these were the core of the "business of insurance." [T]he focus [of the statutory term] was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance." *SEC v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S. Ct. 564, 568, 21 L. Ed. 2d 668 (1969).

The Kentucky AWP laws deal directly with the relationship between insurers and insureds under health benefit plans. They affect restrictions by the insurers on the number of health care providers available to the insureds under such plans; they increase benefits to the insureds by giving them greater freedom to choose health care providers under the plans; and they are aimed at regulating this insurance relationship. They are part of a comprehensive subtitle of Kentucky's insurance code regulating health benefit plans, and they are, in our view, clearly laws which, in a common sense view of the matter, "regulate insurance" and thus are saved from preemption.

---

insured plans, "there is no applicable state law to which the administrator must conform." More importantly, however, is the fact that the present Kentucky AWP statute, Ky. Rev. Stat. Ann. § 304.17A-270, prohibits only health *insurers* from discrimination and would have no application to an entity acting merely as an administrator of an insurer's plan. Although the chiropractic statute still refers to a prohibition against "health benefit plans" discrimination, Ky. Rev. Stat. Ann. § 304.17A-171(2), the majority believes that, properly construed, this encompasses insurers of health benefit plans and not mere administrators of such plans.

Consideration of the three McCarran-Ferguson factors used in the second step of the analysis as "checking points" or "guideposts" does not require a different result. First, although certainly a debatable issue, we agree with the reasoning of the Fourth Circuit in *Stuart Circle Hospital Corp. v. Aetna Health Management*, 995 F.2d 500 (4th Cir. 1993), that the first factor – "transferring or spreading the policyholder's risk" – is satisfied:

There are several components to the "policyholder's risk." They include the types of illness and injury that the insurance contract covers, provision for treatment, and the cost of treatment. The Virginia statute affects the type and cost of treatment available to an insured. If a PPO unreasonably restricts the providers of treatment, even though they meet the insurer's standards, it denies an insured the choice of doctor or hospital that may best suit the insured's needs, unless the insured is willing and able to pay all or part of the cost of the doctor or hospital that is not preferred by the insurer. This is a restriction of the insured's benefits. By its prohibition against unreasonable restriction of providers, the Virginia statute spreads the cost component of the policyholder's risk among all the insureds, instead of requiring the policyholder to shoulder all or part of this cost when seeking care or treatment from an excluded doctor or hospital of his or her choice.

*Id*. at 503.

Plaintiffs point out that the Kentucky statutes in question do not require health benefit plans to contract with any additional provider, but only with providers who are willing to meet the network's terms and conditions. While this is unquestionably true, it does not, in our view, change the fact that the statutes open an otherwise closed door, insofar as the availability of health care providers is concerned. Some may choose to go through that door and join the group of providers while others may not, but this does not mean that removal of a restriction

In Plaintiffs' view, the second factor is not satisfied because the AWP provisions leave the contract terms between the insurer and the insured unaltered, the medical risks remain the same, and even if an insured's provider decides to join the insured's network, the medical coverage remains the same. While it is admittedly true that the AWP laws do not change the substantive terms of the insurance coverage, it is not necessary that the statutes do this before they can be found to be statutes regulating insurance. *Id.* Kentucky's AWP laws do, however, directly impact the insurer-insured relationship because they affect restrictions on the network of providers available for treatment under the plan and they directly affect the administration of the plan. As in *Ward*, the statutes effectively create a mandatory contract term dealing with the manner in which the plan is administered by expanding covered treatment from a closed pool of providers to an open pool of providers. As the Fourth Circuit said in *Stuart Circle Hospital Corp.*, 995 F.2d at 503, "We repeat, treatment and cost are important components of health insurance. Regulations governing these components, such as the Virginia statute, are integral parts of the relationship between insurer and insured." In our view, the second McCarran-Ferguson factor is clearly satisfied.

We also conclude that the third factor – the statute's limitations to entities within the insurance industry – is satisfied. For reasons stated earlier, we believe that entities such as HMOs and self-insurers are engaged in the business of insurance along with the more widely recognized and more traditional commercial insurance companies, and that entities acting solely as plan administrators and not as "health insurers" are not within the scope of the statute. As District Judge McKinley pointed out in *Community Health Partners*:

Whatever difference in form or structure that exists as between traditional insurance companies and HMOs, MEWAs, and provider-sponsored integrated health delivery networks is insufficient to establish that Kentucky's AWP law is not limited to entities within the

the antitrust law exemption (*see* 15 U.S.C. § 1012(b)).[19] The first clause, which commits laws "enacted by any State for the purpose of regulating the business of insurance" to the States is, according to the Supreme Court, "not so narrowly circumscribed." *Id.* at 504, 113 S. Ct. at 2209, 124 L. Ed. 2d at 461.

The second McCarran-Ferguson factor is, in our view, unquestionably present in this case. The ability of an insured to select a physician of his or her choice to treat a medical condition covered by the insurance is an integral part of the policy relationship between the insurer and the insured. In *Ward*, the Supreme Court dealt with a state law which required an insurer to show that it was prejudiced by an untimely proof of claim before it could avoid liability. The Court, as noted earlier, did not even pursue the issue of whether the statute satisfied the first factor – the risk alteration factor – because the other two factors verified the common sense view of the statute as one regulating insurance. The Court specifically rejected the argument that the statute was not such a law because it did not change any substantive terms of the insurance coverage.

> We reject UNUM's suggestion that because the notice-prejudice rule regulates only the administration of insurance policies, not their substantive terms, it cannot be an integral part of the policy relationship. *See Metropolitan Life*, 471 U.S. at 728 n.2, 105 S.Ct. 2380 (including laws regulating claims practices and requiring grace periods in catalogue of state laws that regulate insurance).

526 U.S. at 375 n.5, 119 S. Ct. at 1390, 143 L. Ed. 2d at 477.

---

[19] The Court in *Royal Drug* said, "It is well settled that exemptions from the antitrust laws are to be narrowly construed." 400 U.S. at 231, 99 S. Ct. at 1083, 59 L. Ed. 2d at 280.

on availability of providers is not a benefit conferred on the insureds. It effectively changes the terms of the policy, admittedly not in terms of covered medical conditions, but in terms of covered treatment by health care providers.[16]

While Plaintiffs understandably rely on *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S. Ct. 1067, 59 L. Ed. 2d 261 (1979), in support of their position that the first factor is not present in this case, we believe *Royal Drug* does not require that conclusion. Unlike the health plans that are the subject of the Kentucky statutes, the insurer in *Royal Drug* did not restrict the number of providers in question. Blue Cross had offered to enter into a provider agreement with every licensed pharmacy in Texas. The benefit conferred on the insureds by the Kentucky AWP statutes – removal of restrictions on the number of providers – was already present in *Royal Drug*. The Supreme Court expressly noted, with reference to its discussion of contracts between the insurer and providers, "[t]his is not to say that the contracts offered by Blue Shield to its policyholders, as distinguished from its provider agreements with participating pharmacies, may not be the 'business of insurance' within the meaning of the [McCarran-Ferguson] Act." *Id.* at 230 n.37, 99 S. Ct. at 1082, 59 L. Ed. 2d at 279. Unlike *Royal Drug*, policyholders in Kentucky will benefit under their policies by

---

[16] The dissent characterizes this conclusion as "mysterious." There is no mystery, however, in the undeniable fact that there is a difference between a closed network of providers chosen by the insurer and an open network of providers consisting of all providers – including providers preferred by the insured patients – who are willing to agree to the same terms as the other network providers. It is an extremely significant difference and one which not only changes the conditions of the plan but, by opening an otherwise closed door, expands the potential for inclusion of additional equally competent medical providers. It is in this sense that the AWP laws change "the terms of covered treatment by health care providers."

a new change in coverage, insofar as availability of providers is concerned.[17]

The policyholders in *Royal Drug* were "basically unconcerned with arrangements made between Blue Shield and participating pharmacies." *Id.* at 214, 99 S. Ct. at 1074, 59 L. Ed. 2d at 270. They paid a fixed price ($2.00) to a participating pharmacy for each prescription, and consequently they were not concerned with Blue Shield's cost for those prescriptions. Similarly, the policyholders in Kentucky are basically unconcerned with arrangements made between the insurers and participating providers regarding the insurers' cost for the medical services obtained by the insurers. The Kentucky statutes do not seek to change the terms and conditions of those cost arrangements. They merely require that any provider who is willing to meet the same terms and conditions of those arrangements should be allowed to join the list of participating providers. While Kentucky policyholders may be basically unconcerned with the insurers' compensation arrangements with participating providers, it cannot be said that they are unconcerned with a limitation on the number of such providers and the resulting restriction on their freedom of choice in seeking medical treatment.[18]

---

[17] In *American Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.*, 973 F. Supp. 60 (D. Mass. 1997), the court, in considering a Massachusetts AWP statute, distinguished *Royal Drug* on the ground that, "[b]y directing insurers to open their networks, the Act should affect the availability of benefits to insureds by increasing their ability to select pharmacies of their choice. This does concern the relationship between insurer and policyholder, and thus may be considered part of the business of insurance." *Id.* at 71-72.

[18] The dissent states that, "It is true that the AWP laws would likely force insurers to pay higher rates." The economic effect of the AWP laws in question, however, is speculative at best. As one commentator has noted, "While AWP legislation could remove some of the incentive for health care providers to substantially discount their fees, provider reaction will most likely differ according to the number of MCOs (managed care

The Fifth Circuit has also distinguished *Royal Drug* in its discussion of a prior Texas AWP statute pertaining to pharmacies in *Texas Pharmacy Association v. Prudential Insurance Co. of America*, 105 F.3d 1035 (5th Cir. 1997), agreeing with the reasoning of the Fourth Circuit in *Stuart Circle Hospital Corp.* "Unlike the third-party pharmacy agreements in *Royal Drug*, the prior Texas statute directly regulated the terms of the insurance policy between the insurer and the insured." *Id.* at 1041.

Finally, it should be emphasized, in applying the McCarran-Ferguson factors, that "the focus of McCarran-Ferguson is upon the relationship between the insurance company and its policyholders," and state statutes aimed at regulating that relationship, "directly or indirectly, are laws regulating the 'business of insurance.'" *United States Dep't of the Treasury v. Fabe*, 508 U.S. 491, 501, 113 S. Ct. 2202, 2208, 124 L. Ed. 2d 449, 459 (1993). In *Fabe,* the Court held that, "[t]here can be no doubt that the actual performance of an insurance contract falls within the 'business of insurance,' as we understood that phrase in *Pireno* and *Royal Drug*." *Id.* at 503, 113 S. Ct. at 2209, 124 L. Ed. 2d at 461. Furthermore, in *Fabe*, the Court distinguished *Royal Drug* on the ground that it was an antitrust law case, and the Court in that case was construing the words, "the business of insurance" contained in the second clause of § 2(b) of the McCarran-Ferguson Act,

---

organizations) and providers present in each market." James W. Childs, Jr., *You May Be Willing, But Are You Able?: A Critical Analysis of "Any Willing Provider" Legislation,* 27 Cumb. L. Rev. 199, 210 (1996-1997). The same author reports that, insofar as any increase in consumer cost is concerned, there is some evidence that health care costs have not risen in those states that have enacted AWP legislation. *Id.* at 212. The possible economic effect on insurers must be weighed against "... the fact that managed care threatens Americans' right to freely choose their provider, and AWP legislation protects that right." *Id.* at 217-218. In any event, the decision of the Kentucky legislature to enact AWP laws is one left to the wisdom of that deliberative body, and the possible economic ramifications of its AWP laws should not concern this court.